UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHEVRON PRODUCTS COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>ADVANCED CORROSION<br>TECHNOLOGIES & TRAINING, LLC,<br><br>        Defendant. | Case No. 20-cv-09095-VC<br><br>**ORDER SANCTIONING COUNSEL** |

I

In late December 2023, David A. Ericksen submitted three motions on behalf of his client, Advanced Corrosion Technologies & Training: a motion for summary judgment, a motion for spoliation sanctions, and a motion to exclude readings taken at a site inspection. At the hearing on those motions, the Court noted that numerous aspects of the briefing and filings in support were misleading. Chevron filed a motion for attorneys' fees incurred responding to the two discovery motions. Chevron then withdrew the motion for fees after the parties notified the Court of a tentative settlement of the entire case. Given the nature of the attorney conduct noted by the Court and described in Chevron's fees motion, the Court issued an Order to Show Cause why Ericksen should not be sanctioned for that conduct. The Court accepted a filing from Ericksen and a responsive filing from Chevron, and the Court held a hearing at which Ericksen was heard through his counsel.

Pursuant to the Court's inherent authority, Ericksen is sanctioned for making misrepresentations and misleading statements in a sworn affidavit submitted in support of ACTT's Motion to Exclude Reading. Dkt. No. 73-1. Ericksen is ordered to pay $500 to the Clerk

of the Court and to pay the reasonable attorneys' fees incurred by Chevron in responding to the Order to Show Cause and appearing at the corresponding hearing. And because Ericksen's misrepresentations were so blatant, the Court will refer this matter for an investigation by the California Bar.

The affidavit that forms the basis of this sanctions order was by no means the only misleading conduct committed by Ericksen in defending this action.[1] But it was the most egregious. Moreover, the statements from that affidavit that are discussed in this ruling were also contained in Ericksen's affidavits used to support ACTT's other contemporaneously filed motions. Since it is sanctionable conduct alone, this ruling will focus on that one affidavit.

II

The motion to exclude readings was substantially based on ACTT's assertions that Chevron's counsel had engaged in misconduct during discovery negotiations as the parties were arranging a site visit to Chevron's refinery. Ericksen's declaration was the *only* piece of evidence submitted by ACTT regarding what occurred during those negotiations. Ericksen's declaration contained several misstatements, ranging from misleading to false. There's no need to canvas all the misstatements; a few examples will suffice.

To start with, the declaration states that "beginning in January 2022, there were numerous teleconferences between counsel . . . regarding a site inspection as well as providing [ACTT] an

---

[1] For example, ACTT moved for summary judgment on the basis that Chevron had not provided ACTT with notice of the alleged defects that form the basis of the lawsuit. Dkt. No. 72. Ericksen's signature appears on that motion. The motion repeatedly used language suggesting that there was no notice whatsoever. *See, e.g.*, Dkt. No. 72 at 2 ("Chevron never gave ACTT any notice of the alleged issues with the seven circuits, as required by the Parties' Chevron-drafted Agreement."); *id.* at 3 ("The lack of notice is fatal to any and all of Chevron's claimed remedies."); *id.* at 8 (". . . without giving notice."). However, the motion failed to mention that Chevron did provide ACTT with two written letters which stated that it found all of ACTT's services defective. Defending against summary judgment, Chevron attached two notices as exhibits. In response, ACTT replied that those notices were insufficiently specific to be contractually compliant. But ACTT was aware of these allegedly nonspecific notices when it filed its moving papers. Regardless of the merit of ACTT's arguments that the notices were not legally sufficient under the contract, it was misleading for ACTT to suggest there had been no notice at all, and for ACTT not to disclose the notices in its motion and make its specificity argument at the outset.

opportunity to perform necessary retro-PMI testing." Dkt. No. 73-1 at 2. There is no mention in the declaration of any email records or email exchanges. And there were no emails attached as exhibits. That suggests that the events described in the affidavit occurred in phone conversations. But there were many emails sent back and forth during discovery negotiations, including emails that discuss the issues mentioned in the affidavit. And Ericksen was copied on all of them. Meanwhile, the affidavit contains no further description of any particular oral conversations. At the motion hearing, Ericksen represented that there were phone calls that he was aware of that supported his statements—but he could not specify when they occurred, whether he had personal knowledge of them, who the parties were, or what was discussed at each one. That hardly forms a reliable basis for a sworn affidavit.

Next, consider the following statement in the declaration: "Chevron led ACTT on for months as ACTT personnel attempted to comply with Chevron's proposed training protocol. The parties initially agreed to schedule a site inspection during the week of March 28, 2022, but Chevron would not permit ACTT entry to the refinery at that time on the grounds that ACTT had not yet completed its ambiguous and ill-defined entry requirements." Dkt. No. 73-1 at 3.

This is contradicted by the email traffic that Erickson omitted from his presentation. In late January, when discussing the site inspection, Chevron informed ACTT that "any persons that set foot in the Refinery need to undergo training protocols" and that it would "include a day-long OSCA course, as well as a several hour site course." Dkt. No. 109-2. Then, in late February, Chevron offered another alternative, which was that ACTT's expert could enter the refinery with a Chevron employee escort or a contractor who has already been trained and approved by Chevron—that already-trained individual could run the test for ACTT's expert, under their observation. Dkt. No. 109-3. A few days later, ACTT responded that that alternative seemed desirable. A few days after that, Chevron responded with the names of several contractors. Dkt. No. 109-4. But it seems that ACTT did not take that direction.

Then, on March 14, the parties confirmed March 28 as the date for a site inspection and Chevron sent over the full training requirements. On March 18, ACTT said it was still working

3

to see if its expert would be able to complete training by March 28. ACTT also asked Chevron about which dates trainings would be held. That same day, Chevron replied that the trainings could be found at the links previously sent, and asked ACTT to work with its own expert to coordinate his training. At that point, ACTT asked Chevron to review its expert's various existing certifications and allow those certifications to stand in for Chevron's training requirements. And Chevron responded by reaffirming what it said back in January—that the training was mandatory for anyone working at Chevron's Richmond Refinery—and reminding ACTT of the alternative offered in February—that a Chevron representative or already-trained contractor could do the work under the expert's supervision. On March 23, ACTT said that its expert could not complete the training by the scheduled date. At that point, the site inspection for March 28 was cancelled. Dkt. Nos. 109-4; 109-5. When ACTT's expert did ultimately begin the training, there is no evidence suggesting that he found Chevron's requirements confusing. It was not until June that ACTT told Chevron that its expert had completed training. The expert's training certificates indicate that he only began the trainings in mid-April.

   Recall Ericksen's sworn statements about what happened. There is no evidence Chevron "led ACTT on for months" about the training. There is no evidence that Chevron had "ambiguous and ill-defined entry requirements." And there is no evidence that "ACTT personnel attempted to comply" with the training requirement in advance of the March 28 date.

   Unfortunately, Ericksen's response to the Order to Show Cause suggests that he still does not fully understand, or own up to, the misleading nature of his statements about the training. For example, he maintains that Chevron changed up the training requirements, construing Chevron's initial email as a representation that the training was "limited to" what was described in the January email. Dkt. No. 126 at 4. But the email says "including"—which is obviously different from "limited to." Similarly, Ericksen emphasizes that it was only on March 14 that the full training requirements were disclosed. That is technically true. But it does not justify his descriptions of the communications. Finally, Ericksen suggests that any misrepresentation was about his having said that Chevron *refused* entry, when he should have said that Chevron wou*ld*

4

*have refused* entry. But, of course, that was not the issue.

Of course, the Court would prefer not to wade into the minutiae of communications between counsel regarding discovery. Miscommunications happen, even between parties negotiating in good faith. But Ericksen himself put these emails at issue when he sought relief from the Court based on his own misleading statements about what happened when scheduling the site visit—without even attaching the supporting emails to give the Court an opportunity to assess the veracity of his claims.

The misrepresentations do not end there. Ericksen also stated: "Despite ACTT's eventual compliance with [Chevron's] training prerequisites, [Chevron] refused to permit ACTT an opportunity to complete a site visit or additional testing before commencing with maintenance and replacement efforts during what [Chevron] refers to as a 'Turn-Around.'" Dkt. No. 73-1 at 3. This is misleading. Chevron consistently informed ACTT that the Turn-Around would begin in May, but ACTT did not inform Chevron of its expert's compliance with the training requirement until June. Ericksen's statement clearly suggests that there was a period of time post-training and pre-Turn-Around in which ACTT was denied entry. But that time period never existed.

Ericksen's defense of this statement is somewhat confusing. But his core point seems to be that ACTT never understood that the May maintenance would be so widespread that refinery entry would be entirely impossible. In other words, Ericksen is now claiming that he took Chevron's emphasis on the importance of conducting an inspection prior to May to be about what was ideal and not what was necessary, he understood that ACTT could still conduct a site inspection while the Turn-Around was ongoing, and he thought that Chevron could hold off on replacing the parts at issue in the lawsuit even if they were part of the Turn-Around. That Ericksen truly believed these things is highly dubious—it seems like a ham-fisted, post-hoc attempt to avoid responsibility for his misrepresentations. But even if Ericksen somehow truly understood things this way at the time, it does not justify what he wrote in his affidavit, which reflected none of that nuance.

Take another of Ericksen's statements: "Plaintiff Chevron represented to Defendant

5

ACTT that it would not remove or replace the disputed components prior to providing ACTT access to the equipment for an assessment. Nevertheless, Chevron still proceeded to remove, replace and destroy various circuits, welds, and components that are at issue in this case—despite ACTT's best efforts to meet Chevron's entry requirements." Dkt. No. 73-1 at 3. As noted, ACTT's conduct regarding the training was hardly its "best efforts." But more importantly, there is no representation by Chevron in any of the attached emails that Chevron would not remove or replace the disputed components prior to an inspection. In fact, despite multiple efforts to get Chevron to promise as much, Chevron refused to make commitments about what components of the refinery might be affected by the refinery-wide Turn-Around.[2] Ericksen defends his statement just as he did the prior one; he says it reflected his understanding that ACTT could still conduct a site inspection after the May Turn-Around had begun and before the particular component pieces were affected. But, again, that is not what his affidavit said.

      One final example. The parties ultimately scheduled an inspection for September, after the Turn-Around was complete. Regarding the September inspection, Ericksen states that "Chevron's counsel advised ACTT's counsel that ACTT would be provided a Hot Work Permit for the joint inspection." Dkt. No. 73-1 at 4. He also described Chevron as having provided an "assurance of a Hot Work Permit." *Id.* But Chevron's counsel made no such promise.

      The inspection was scheduled for September 19. On September 9, ACTT sent an email about various inspection logistics, and the email included the line: "Lastly, please provide the hot work permit for the PMI inspection on September 19th." Dkt. No. 109-9. That same day, Chevron responded with various other questions about the logistics. Regarding the permit, Chevron said: "What do you mean by 'hot work permit'? This is the first time you are requesting a permit. The only testing that we have discussed is testing with a PMI gun, so it is unclear why a permit would be required." *Id.* In response, ACTT answered the other logistics

---

[2] Chevron does submit evidence suggesting that it identified and tagged the components at issue for preservation consistent with its discovery obligations. This is the subject of a separate motion and set of evidence, and so the Court will not wade into it for the purposes of this sanctions motion.

question and provided more detail about the permit request. Regarding the permit, ACTT elaborated its understanding that the permit was required for testing at the refinery and that ACTT had needed the permit in the past when it had performed similar work for Chevron. *Id.* In response, mere minutes later, Chevron responded, "Got it, thank you" to the whole email, and asked a final follow up question about ACTT's expert's affiliations. Dkt. No. 127 at 9.

Chevron asserts that it never intended to secure a hot work permit because ACTT was incorrect in its understanding that one was needed to perform the PMI inspection. Ericksen states in response to the Order to Show Cause that he understood "Got it, thank you" to represent Chevron's agreement to provide a hot work permit. But, again, even crediting as honest Ericksen's strained, after-the-fact explanation of his understanding of the emails, the statement in the declaration was misleading. There was no advisement or assurance that a hot work permit would be provided. And the declaration was submitted in support of a Motion asking the Court to exclude readings taken at the site visit because the lack of hot work permit prevented ACTT from conducting a certain kind of testing. So, it is material whether Chevron engaged in a bait and switch or whether ACTT was not diligent enough about ensuring it could perform the kind of testing that it wished. And Ericksen swore, in a highly misleading fashion, that it was the former.

The Court finds that these misrepresentations and misleading statements were made in bad faith. *See Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001). The gap between the affidavit and the email evidence mostly speaks for itself. As does Ericksen's decision not to submit any of the email evidence with his affidavit. But to the extent that there was any doubt, Ericksen's subsequent actions confirm a bad faith finding.

After ACTT filed this motion and Ericksen's supporting declaration, Chevron took a few steps. First, it sent a Rule 11 letter which asserted that "nearly every factual allegation in [Ericksen's] declaration regarding the September 19, 2022 site inspection is false." Dkt. No. 109-10. The letter further emphasized the statement about "numerous teleconferences" at the start of the declaration, noting that the negotiations were conducted over email and that those emails

7

contradicted the assertions in the declaration. *Id.* Chevron requested Ericksen withdraw the motion and declaration. He did not. Then, Chevron filed its opposition to the motion to exclude readings. It attached almost every email described in this ruling in support of its opposition brief. (And the problems canvased in this ruling were not the only ones.) Still, Ericksen withdrew neither the motion nor the declaration. In his reply, Ericksen did not correct the record or amend any of his assertions from the declaration. Instead, he shifted gears some—he zeroed in on the question of whether the inspection method used in September was scientifically reliable. And, tellingly, he shifted his representations about the Hot Work Permit to be technically accurate, asserting that the permit was requested ten days before the inspection and that Chevron did not make any effort to secure one. Dkt. No. 90 at 2–3. Similarly, he submitted a declaration by the associate who actually engaged in the discovery correspondence. Also tellingly, that associate does not describe a promise of a hot work permit; rather, she states that she "expected" one. Dkt. No. 90-2. However, Ericksen does not walk back any of what was said in his own declaration. Finally, at the hearing, the Court asked Ericksen directly if he still stood behind the representations made in his declaration, and behind his decision not to withdraw it—Ericksen expressly affirmed that he continued to believe that the testimony in his affidavit was true. In sum, despite being confronted with contrary evidence, and despite numerous opportunities to withdraw or correct his declaration after being confronted with that evidence, Ericksen continued to press the statements.

In response to the Order to Show Cause, Ericksen again changes tact. His brief and supporting declaration are full of careful descriptions of what precisely he believed and understood at the time of the negotiations. He ascribes much of the confusion to inartful drafting and careless wording. At the same time, he says that painful personal circumstances during the time of discovery negotiations caused him to allow his associate to take the lead, which resulted in him having a more arms-length understanding of what was happening. He also suggests he did

8

not have access to all the discovery emails at the time of writing his declaration.[3]

But none of that is a meaningful defense to the totality of his misconduct. If Ericksen lacked personal knowledge regarding the discovery communications, then he should not have submitted a strongly worded affidavit making unequivocal representations about those communications. If Ericksen believed his statements to be roughly true based on the detailed, nuanced descriptions of his understanding that are contained in his response to the Order to Show Cause, then it was those understandings that should have been conveyed in his affidavit. And if Ericksen realized he had overclaimed and misled the Court, as is suggested by the content of his reply, then he should have corrected the record at any of the many opportunities that he was given to do so. At the motion hearing, when asked directly about these misrepresentations, he continued to affirm them and to rely on them to seek relief from the Court—asking for the exclusion of evidence and for discovery-related sanctions.

In sum, Ericksen's misstatements were made in bad faith: the initial declaration was made in bad faith, and certainly his subsequent reliance on it was in bad faith. However, even if Ericksen's misstatements were merely reckless, his recklessness combined with the frivolity of the discovery motions that the misstatements supported would also be a sufficient basis for sanctions. *See Fink*, 239 F.3d at 989.

### III

Within 7 days, Chevron shall submit evidence showing the fees that it incurred responding to the Order to Show Cause and appearing at the hearing on the same. Ericksen shall then have another 7 days to either object to the reasonableness of Chevron's submission or pay that amount. Also within 14 days, Ericksen shall send a check to the Clerk's Office for the $500 fee payable to the Court, and Ericksen shall attach a copy of this ruling to his payment.

**IT IS SO ORDERED.**

Dated: May 30, 2024

---

[3] Chevron's counsel contests this assertion, stating that they sent the entire email exchange over to Ericksen as a professional courtesy before his motion and declaration were filed.

_____
VINCE CHHABRIA
United States District Judge